IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 23-CR-00356-GKF |
| YONATON PEREZ, | ) ) ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter comes before the court on the Motion to Suppress [Doc. 22] of defendant Yonaton Perez. For the reasons set forth below, the motion is denied.

**Background/Procedural History**

On April 7, 2023, at approximately 11:00 p.m., Tulsa Police Department Officers Cory Franks, James Kidd, and Michael Terwilliger approached a parked vehicle occupied by Mr. Perez and a passenger. The encounter eventually resulted in Officer Terwilliger patting down Mr. Perez and discovering two large plastic bags containing a total of 666.13 grams of methamphetamine in the front pocket of Perez's hoodie Officers also seized Mr. Perez's cell phone.

On November 7, 2023, a grand jury returned an Indictment charging Mr. Perez with a single count of Possession of Methamphetamine with Intent to Distribute pursuant 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii). [Doc. 10]. Trial of this matter is scheduled to begin on December 18, 2023. [Doc. 17].

In advance of trial, Mr. Perez filed the motion seeking to suppress the methamphetamine and cell phone seized during the April 7, 2023 encounter. [Doc. 22]. The government has responded in opposition. [Doc. 26].

Neither Mr. Perez nor the government has requested an evidentiary hearing. [Doc. 22; Doc. 26]. Having reviewed the briefs and evidence in this matter, and in light of the fact that a hearing has not been requested, the court concludes that the motion may be decided on the briefs and a hearing is unnecessary.

**Relevant Facts**

At about 11:00 p.m., on the night of April 7, 2023, Officers Franks, Kidd, and Terwilliger were patrolling as a three-officer unit in the area of 81st and Mingo in Tulsa, Oklahoma—specifically, near Midleton's Bar. [Doc. 22-2, pp. 8-9, 23-24, 44] Midleton's Bar is known to be a high-crime area during particular days and hours. [*Id.* at pp. 8, 24, 44-45].

The officers pulled into the northern parking lot behind Midleton's and observed a parked maroon GMC Terrain with its lights on. [*Id.* at pp. 9-10]. Officers observed two people in the vehicle. [*Id.* at p. 10]. When the officers first observed the vehicle, the windows were partially rolled down, but as the patrol unit drove around, the occupants of the vehicle rolled all four windows up at the same time. [*Id.* at pp. 10 and 25]. The rolling up of the windows was significant to officers as it was a "distinct change in behavior" at the sight of police. [*Id.*]. Officer Kidd, who was driving the patrol unit, parked and approached the GMC Terrain. [*Id.* at pp. 25-26].

Officer Kidd made contact with Mr. Perez, who was seated in the Terrain's driver's seat and seemed very nervous. Officer Kidd asked if he and his passenger were "just hanging out," and Mr. Perez responded that they were waiting for his girlfriend. [Doc. 22-1]. Officer Kidd testified that Mr. Perez's explanation "didn't seem to . . . be true." [Doc. 22-2, p. 38].

At the time of the contact, Mr. Perez was holding a vape pen. [Doc. 22-1; Doc. 22-2, pp. 26-27]. Officer Kidd was concerned about Mr. Perez's use of the vape as Mr. Perez "appeared to be very young, under 21 years of age." [Doc. 22-2, p. 28]. Officer Kidd asked Mr. Perez how old

2

he was and Mr. Perez responded that he was eighteen. [Doc. 22-1, Doc. 22-2, p. 28]. Officer Kidd asked if what he was holding was a vape pen, and Mr. Perez responded affirmatively. [Doc. 22-1]. Officer Kidd then informed Mr. Perez that persons under twenty-one could not possess a vape pen under Oklahoma law and asked to see Mr. Perez's identification. [Doc. 22-1].

Officer Kidd informed Officer Terwilliger, who had walked up to the Terrain's driver's side window, that Mr. Perez was eighteen and in possession of a vape pen. Officer Kidd said, "have Mr. Perez step out for me." [Doc. 22-1; Doc. 22-2, pp. 28-29]. Mr. Perez responded, "is there a reason why I'm stepping out?" Officer Kidd responded, "yeah, you can't have a vape pen at eighteen years old my guy." [Doc. 22-1].

Officer Terwilliger then stated, "we're not really stressing about a vape pen," as Officer Kidd opened the driver's side door. While still seated in the Terrain, Mr. Perez stated, "I mean, I didn't do nothing bad." Officer Terwilliger responded, "Ok, well listen, check it out, we ain't stressin' about a vape pen. Any firearms in the car?" Mr. Perez remained seated in the vehicle and said, "Nah, I mean I know my rights." Officer Terwilliger responded, "You didn't answer my question though. For your safety and mine, are there any firearms in the car?" Mr. Perez responded, "no," while seated in the driver's seat and began texting on his cell phone. [Doc. 22-1]. Officer Terwilliger moved toward Mr. Perez and said, "don't be texting, just leave your phone right there and face the door jam when you come out." [*Id.*; Doc. 22-2, p. 48].

Mr. Perez stepped partially out but kept his right leg in the vehicle "kind of propped up on the floorboard." [Doc. 22-2, p. 48]. Officer Terwilliger later described Mr. Perez as "hesitant to comply." [*Id.*].

At the time of the stop, Mr. Perez was wearing a hoodie. [Doc. 22-1, Doc. 22-2, p. 48]. As Mr. Perez got out of the Terrain, Officer Terwilliger noticed Mr. Perez "had something of

3

significant size in his hoodie pocket. It was hard. It felt like plastic, but some kind of rock-like substance. It was significant. It was a bulge in his pocket." [Doc. 22-2, p. 49]. Officer Terwilliger testified that the bulge concerned him because he "wasn't sure what that was right away" and he wanted to ensure his and the other officers' safety. [*Id.*]. Before Officer Terwilliger pulled the item from the hoodie pocket, he felt it. Officer Terwilliger testified it felt "like a plastic wrapped – just the way it crinkled when I had my hand on it – rock-like substance." [*Id.*]. Although, in his experience, a large bulge indicates "large amounts of methamphetamine," he couldn't "say a hundred percent what [he] thought it was." [Doc. 22-2, pp. 49-50].

Officer Terwilliger subsequently retrieved two "very large" plastic bags with a rock-like substance inside from Mr. Perez's hoodie pocket.[1] [Doc. 22-1; Doc. 22-2, pp. 30, 50]. The substance in the large plastic bags was alter determined to be a total of 666.13 grams of methamphetamine.

**Analysis**

Mr. Perez seeks to suppress the challenged evidence for two reasons. First, Mr. Perez contends that his detention was unconstitutional because the officers did not have reasonable suspicion that he had committed a crime as required by *Terry v. Ohio*, 392 U.S. 1 (1968). Second, Mr. Perez argues that Officer Terwilliger exceeded the scope of detention by searching Mr. Perez's hoodie pocket. The court separately considers each argument.

    A.    *Initial Terry Stop*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Under the Fourth Amendment, an investigative detention such as the one that occurred here is

---

[1] Based on the court's review of the body camera footage, the bags appear to be gallon size freezer bags. [Doc. 22-1].

reasonable if it is (1) 'justified at its inception' and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009) (quoting *United States v. Johnson*, 364 F.3d 1185, 1189 (10th Cir. 2004)); *see also United States v. Madrid*, 713 F.3d 1251, 1255-56 (10th Cir. 2013) (internal citation omitted) ("In *Terry v. Ohio*, the Supreme Court established a two-pronged test to determine the reasonableness of investigatory detentions.").

The U.S. Court of Appeals for the Tenth Circuit has recognized that "[a]n investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *Madrid*, 713 F.3d at 1256 (quoting *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011)). To determine whether reasonable suspicion exists, the court must consider "the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "While reasonable suspicion cannot be based upon a mere hunch, it also need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Frazier*, 30 F.4th 1165, 1174 (10th Cir. 2022) (quoting *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011)). Accordingly, the Tenth Circuit has recognized that "as long as [the detaining officer] has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality." *Madrid,* 713 F.3d at 1256 (quoting *Johnson*, 364 F.3d at 1194).

Mr. Perez argues reasonable suspicion did not exist because, at the time of the stop, Oklahoma law—specifically, Okla Stat. tit. 10A, § 2-8-224—did not permit municipal enforcement or identify a punishment for possession of a vapor product by a person under the age of twenty-one.[2]  Rather, at the time of the stop, § 2-8-224 provided that, when a person violated the section, the Alcoholic Beverage Laws Enforcement (ABLE) Commission "shall require the violator to complete an education or tobacco use cessation program approved by the State Department of Health."  Okla. Stat. tit. 10A, § 2-8-224(B) (superseded effective November 1, 2023).  Because the statute is akin to a civil proceeding, Mr. Perez argues that officers lacked reasonable suspicion that Mr. Perez was committing *a crime*.

However, the U.S. Supreme Court has held that officers may stop a vehicle where they have probable cause to believe that a violation of civil traffic regulations occurred.  *Whren v. United States,* 517 U.S. 806 (1996).  The Tenth Circuit has recognized that "since *Whren* the Supreme Court has not suggested that there is any distinction between civil and criminal traffic infractions for Fourth Amendment purposes."  *United States v. Meadows*, 970 F.3d 1338, 1341 (10th Cir. 2020).  Likewise, other Circuits have concluded that parking violations under civil administrative schemes justify a *Terry* stop.  *See United States v. Choudhry*, 461 F.3d 1097, 1103-04 (9th Cir. 2006); *Flores v. City of Palacios*, 381 F.3d 391, 402-03 (5th Cir. 2004); *United States v. Copeland,* 321 F.3d 582, 594 (6th Cir. 2003); *United States v. Thornton,* 197 F.3d 241, 248 (7th Cir. 1999).[3]  Thus, it does not appear that a criminal penalty is required to justify a *Terry* stop.

---

[2] On the date of the *Terry* stop, § 2-8-224(A) stated:  "It is unlawful for a person who is under twenty-one (21) years of age to purchase, receive, or have in his or her possession a tobacco product, nicotine product, or vapor product."  Okla. Stat. tit. 10A, § 2-8-224(A).

[3] This court recognizes that, in *Meadows*, the Tenth Circuit suggested that "traffic stops are unique." *Meadows*, 970 F.3d at 1340.  However, the court sees no meaningful distinction between civil traffic schemes and the statute at issue in this matter.  Both are directed to public health and safety.

Mr. Perez also argues that Tulsa Police Department officers lacked authority to enforce the statute, reasoning that "[e]arlier and subsequent versions [of § 2-8-224] contain a provision essentially authorizing local law enforcement to enforce ordinances prohibiting this conduct," but "[t]here was no similar provision in effect at the time of Mr. Perez's search." [Doc. 22, p. 19].

However, pursuant to Okla. Stat. tit. 11, § 34-101, "[a] municipal police officer shall at all times have the power to make or order an arrest for *any offense* against the laws of this state." Okla. Stat. tit. 11, § 34-101(A) (emphasis added). The Oklahoma Supreme Court has recognized that the statute "gives municipal police officers express authority to enforce the laws of Oklahoma." *Haworth v. Cent. Nat'l Bank of Okla. City*, 769 P.2d 740, 743 (Okla. 1989). The authority is not limited to penal statutes, nor imposition of fines or citations. Rather, it is a broad grant of authority to enforce Oklahoma statutes.

As previously stated, at the time of the *Terry* stop, § 2-8-224 explicitly provided that "*[i]t is unlawful* for a person who is under twenty-one (21) years of age to purchase, receive, or have in his or her possession a tobacco product, nicotine product or vapor product." Okla. Stat. tit. 10A, § 2-8-224(A) (superseded effective Nov. 1, 2023) (emphasis added). Tulsa Police Department Officers Franks, Kidd, and Terwillger, as municipal officers, were expressly authorized to enforce the law.[4] Thus, the officers did not lack authority to enforce a violation of § 2-8-224 on the date of the *Terry* stop.

Based upon Mr. Perez's admitted violation of § 2-8-224, the *Terry* stop was justified at its inception. Thus, Mr. Perez's first argument does not warrant suppression.

---

[4] To conclude otherwise would result in there being no enforcement mechanism apart from the ABLE Commission nor any means to discover and report violations to the ABLE Commission.

B.      *Scope of Detention*

As previously stated, Mr. Perez also argues that Officer Terwilliger exceeded the permissible scope of the *Terry* stop by searching Mr. Perez's hoodie pocket.

"During a valid investigatory detention, officers may conduct a limited protective search (commonly called a pat-down search or frisk) if they develop an articulable and reasonable suspicion that the subject is armed and dangerous." *United States v. Gurule*, 935 F.3d 878, 885 (10th Cir. 2019). "The primary justification for a frisk, of course, is officer safety." *Id.* Thus, "[i]f the officer discovers what he believes to be a weapon, he may reach inside the suspect's clothing and remove it." *United States v. Harris*, 313 F.3d 1228, 1237 (10th Cir. 2002).

"[R]easonable suspicion 'is not, and is not meant to be, an onerous standard,'" and "requires 'considerably less' than a preponderance of the evidence." *Gurule,* 935 F.3d at 885 (quoting *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015)). Further, "the subjective beliefs and knowledge of the officer are legally irrelevant," as "the constitutional inquiry turns on whether an objectively reasonable officer could have feared that the detected objects might be used as instruments of assault." *United States v. Rochin*, 662 F.3d 1272, 1274 (10th Cir. 2011).

Here, Officer Terwilliger testified that he noticed a bulge of "significant size" in Mr. Perez's hoodie pocket. The bulge was hard to the touch, and "rock-like." Officer Terwilliger stated that he "wasn't sure what [it] was right away" and, after touching it, still could not say "a hundred percent what [he] thought it was." Officer Terwillger testified that the bulge concerned him in terms of officer safety. [Doc. 22-2, p. 49]. Thus, Officer Terwilliger "never testified that he ruled out that the object was a weapon." *Harris,* 313 F.3d at 1237.

The court recognizes that Officer Terwilliger testified that, in his experience, such bulges may be drugs. However, the Tenth Circuit has recognized that, "[e]ven if, in retrospect, it 'would

8

have been more reasonable to think the hard object was drugs rather than a gun, that does not mean he would have been unreasonable to conclude that it was a gun and not drugs.'" *Harris,* 313 F.3d at 1237. As previously stated, Officer Terwilliger testified that he could not confirm what the object was, but that it was of "significant size" and hard. A *Terry* frisk is not limited to traditional weapons and an officer may remove "any other objects that he reasonably thinks 'might be used as instruments of assault' against him or others who may be in the area." *Rochin,* 662 F.3d at 1274. A large, hard object fits that description. *Id.* Further, Officer Terwilliger testified that Mr. Perez was "hesitant to comply" with his directives. [Doc. 22-2, p. 48]. Under the circumstances, Officer Terwilliger was not unreasonable to conclude that the bulge in Mr. Perez's hoodie pocket may be an "instrument[] of assault."[5] *Rochin,* 662 F.3d at 1274.

Mr. Perez argues that, in touching the bulge, Officer Terwilliger ran afoul of *Minnesota v. Dickerson,* 508 U.S. 366 (1993). However, the Tenth Circuit has interpreted *Dickerson* as holding only that "an officer cannot continue to explore a defendant's clothing after determining it doesn't contain any threatening object." *Rochin,* 662 F.3d at 1275; *see also Harris,* 313 F.3d at 1238 ("What Defendant appears to misunderstand is that the plain-feel exception of *Dickerson* was never invoked in this case; so long as Officer Allen had a reasonable belief that the object he felt might be a gun, he continued to have a right under *Terry* to reach into Defendant's [clothing] to investigate further."). As previously stated, Officer Terwilliger never testified that he ruled out the bulge as being a weapon or other instrument of assault. Thus, *Dickerson* is inapplicable. *See Rochin*, 662 F.3d at 1275. Mr. Perez's motion to suppress in this regard is denied.

---

[5] Insofar as Mr. Perez contends that Officer Kidd exceeded the scope of detention in asking him to step out of the vehicle, the argument is foreclosed by *Pennsylvania v. Mimms*, 434 U.S. 106 (1977). And, once officers observed the bulge in Mr. Perez's hoodie pocket as he stepped out, it was objectively reasonable for Officer Terwilliger to conclude that Mr. Perez might be armed and dangerous, particularly given the location of the stop and Mr. Perez's hesitance to comply with commands. *Id.* at p. 111-12.

## Conclusion

WHEREFORE, the Motion to Suppress Evidence [Doc. 22] of defendant Yonaton Perez is denied.

IT IS SO ORDERED this 8th day of December, 2023.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE